## DWORKIN, INC., Application, In re.

Public Utilities Commission.

No. 4153. Decided April 13, 1960.

Earl N. Merwin, Columbus, for applicant, Dworkin, Inc.

Robert R. Wertz, Pittsburgh, Pa., for the Supporting Shipper, the American Steel and Wire Division of U. S. Steel Corporation.

Richard H. Brandon, Columbus, for C. W. Buck, d. b. a. Buck Transfer, Cleveland Freight Lines, Inc., John Klann Moving and Trucking and Kaplan Trucking Company, Protestants.

George S. Maxwell, Cleveland, for Ohio Highway Express, Inc., and Highway Express, Inc., Protestants.

**SUMMARY OF APPLICANT'S EVIDENCE:**

Mr. Edward J. Dworkin, Vice President of Dworkin Truck Lines, Inc. appeared and testified on behalf of the applicant.

The witness stated that applicant presently holds contract motor carrier Permit No. 3649 and is serving the United States Steel Supply Division of U. S. Steel Corporation and Jones and Laughlin Steel Corp. under that authority. Also that applicant is the holder of a regular certificate to and from Cleveland, Cincinnati, Steubenville, Whitewater and Hamilton, Ohio.

Mr. Dworkin identified the various exhibits which were filed with the application in this case and testified that the balance sheet (Exhibit 3) dated September 30, 1959, substantially reflected applicant's financial condition as of the date of hearing. The witness identified applicant's exhibit A as an affidavit of proof of publication of notice as required by this Commission.

That applicant seeks authority in this case to serve three locations of American Steel and Wire, all of which are located within Cuyahoga County, and are within five miles of the offices and yards of applicant. The applicant has served the proposed shipper in the past under its common carrier authority, the three plants of the American Steel and Wire, which the applicant proposes to serve, produce iron and steel articles of various kinds. In the past, applicant has provided various types of equipment to meet the needs of the shipper.

In the event the instant application is granted the applicant proposes to make equipment available to the shipper seven days a week and to have someone present over the week-end to assist in spotting the equipment. at the shipper's yard.

That Dworkin, Inc. has eight or nine unlicensed pieces of equipment which could be placed in service to meet future needs of the shipper.

**On cross examination:** The witness stated that the balance sheet filed with the application in this case contains the valuation of $42,274.50 for the common carrier certificates held by the applicant.

Being questioned in regard to. the contract filed with the application in this case, the witness noted that no effective date appeared in the contract and that the date of signing is not indicated. (On page 16 of the transcript the following appeared "Q. It would be your understanding that you and the shipper have not yet entered into a contract? A. We have entered into a contract, but we don't have the— wouldn't have the effective date until the Commission rules on this."

That applicant proposes to make three fifteen ton semi-trailers available to the shipper, as noted in the public notice published in accord with the order of this Commission; that more equipment will be added later as needed.

That all of the shippers locations are within the Cleveland Commercial Zone and all rates on shipments would be from Cleveland; the rates which would apply to shipments under consideration in this hearing are those set out in the exhibits as filed with the application in this matter.

That the minimum annual tonnage guaranteed under the contract filed with the application in this matter is 500 tons.

That applicant has occasionally served the Cuyahoga Works of the proposed shipper and has provided the type of equipment called for. That at various times the applicant has been short of equipment and has been unable to serve that plant; the last time being a "couple of weeks" before the hearing. That the ability to serve the shipper depends upon the availability of the type of equipment ordered.

That applicant presently has 5 to 7 pieces of unlicensed equipment which will be put into service and dedicated to the use of the proposed shipper in the event the instant application is granted. If additional equipment is needed to take care of shippers under the irregular and contract authority which applicant holds from this Commission, such equipment would be obtained. The equipment which will be dedicated to the proposed shipper in this case will be based upon their needs.

Under authority as a common carrier applicant has authority to

serve the shipper and that their rates presently on file in applicant's tariff, are adequate to take care of the shippers commodities.

**On cross examination by Mr. Maxwell:** The witness testified that prior to the recent steel strike and thereafter applicant on occasion has not had sufficient equipment to meet the demands of the public and had advertised for the lease of additional equipment. That the unlicensed equipment owned by applicant has not been put into service because the shortage of equipment was not constant.

That applicant presently owns approximately 387 pieces of equipment and leases an additional 25.

In the event the instant application is granted applicant would provide men for spotting of trailers and switching of trailers after they are loaded, also service would be available on a seven day, 24 hour a day, basis. The witness did not know if any of the proposed special services could be performed under the existing authority held by the applicant.

On redirect examination the witness stated that the contract filed with the application in this matter was signed on December 18, 1959.

On further examination by Mr. Brandon the witness stated that he understands that the proposed shipper is only required to comply with the minimum terms of the contract and is not bound to offer additional tonnage.

**Mr. Robert J. Dunn** appeared and testified on behalf of the applicant. The witness testified that he is associated with the American Steel and Wire Division of the United States Steel as Traffic Manager and that he supervises the acquisition of motor carrier service for his company's plants in Ohio.

That under the contract involved in the instant matter the shipper seeks service from their Newbert, American and Cuyahoga Works; that approximately 100 truck loads a day are shipped from these three locations in intrastate commerce, the average shipment being 32,000 pounds, Shipments are made to approximately 50 different points in Ohio.

That his company requires the loading of trucks around the clock, 6 and sometimes 7 days a week. When material is ready for shipment the transportation department is notified, they then attempt to order transportation service from the common carrier who "has the operating authority to service that particular destination and also to protect the lowest published rate to that point." (Tr. Pg. 51.) It is occasionally necessary to call several carriers to obtain the service desired. The witness stated further, that it is necessary to schedule turns for the various equipment to be loaded due to limited warehouse and loading facilities. Failure of carriers to arrive on time can back-up production until the items are moved and space becomes available.

That various types of equipment are needed in the transportation of the shippers products including flat-bed, van, and open type equipment. That if one carrier has all types of equipment, calls can be directed to them and cut down on the number of carriers that must be called.

That he has the responsibility of obtaining motor carrier service;

and that the employees of his company who place the actual day to day orders for equipment report to him.

The witness stated that a record of "no shows" had been kept. This is a record of those carriers who have committed themselves to deliver equipment at a particular date and time and then failed to appear; it does not include those who were unable to provide service when called.

That the proposed shipper does business with approximately 23 carriers in the course of a year; these carriers include substantially all who have solicited the shipper's business. That during the first six months of 1959 approximately 15 of these carriers appeared on the "no show" record, and that some of the 23 carriers were not available on week-ends.

That his company prefers to employ the services of carriers who own their own equipment; that on broker operations the shipper has experienced difficulty in cases where the broker dictates what tonnage is to be hauled.

That the shipper has used the services of Dworkin, Inc. during the first half of 1959 and the service provided was satisfactory although Dworkin Inc. had three "no shows" during that time. The witness stated that his company is supporting the Dworkin application because the Dworkin Company owns their own equipment, has a staff of personnel available on a seven day a week basis, 24 hours a day, has found that Dworkin Inc. will take any type or weight of material to any point in Ohio, and also because the Dworkin organization is located within a short distance of all the points at which his company wants service.

The witness stated that his company is in need of the same day delivery, or at most next day delivery, to all points in Ohio.

**On cross examination by Mr. Brandon:** The witness stated that during the first six months of 1959 approximately 10,000 tons were tendered to Dworkin, Inc. for transportation to various points in Ohio. That on the basis of 32,000 pounds per truck load this would constitute approximately 600 truck loads.

The witness stated that three contract carriers were included in the 23 carriers which his company used during the first six months of 1959. That none of the contract carriers appeared on the "no show" record which was kept by the shipper.

That Dworkin, Inc. presently spots trailers at the shipper's place of business but that they do not now have the variety of equipment which the shipper desires.

The witness stated that he has never called upon Buck Transfer for transportation service nor has anyone from Buck Transfer called upon him to solicit business. The witness stated that his company tendered 145 tons of shipments to the Cleveland Freight Lines Inc. during the first half of 1959.

The witness stated further that his company had not called upon John Klann Moving and Trucking Company or the Kaplan Trucking Company for service during the first six months of 1959.

The witness stated that Cleveland Freight Lines, Inc. is unable

to provide the equipment in the volume which the shipper requires. That during the first six months of 1959 there was one recorded "no show" for the Cleveland Freight Lines, Inc. That his company has no objection to the type of equipment which is operated by Cleveland Freight Lines, Inc.

The witness further stated that he was unfamiliar with the equipment operated by the Buck Transfer and John Klann Moving and Trucking. That he knows the Kaplan Trucking Company operates flat bed equipment but does not know whether or not they operate high-side and low-side flat bed equipment.

On pages 79 and 80 of the transcript the following appears: "Q. Let me ask you this. Do you have any specific complaints you want to register here about the service Dworkin has furnished you in the past? A. I don't have any I want to register, no. Q. Do you have any specific complaint you want to register about the service which Cleveland Freight Lines has rendered you in the past? A. Well, to direct the answer to your question, no. Q. Would you have any objection to calling upon Buck Transfer, John Klann Moving and Trucking or Kaplan Trucking for additional trucking service? A. If I thought they could perform and would perform. Q. As far as you know they are dependable steel carriers in your area? A. To my general knowledge, or knowledge I have of their organization, there is some question whether they are. Q. You don't know? A. I don't know. * * * Q. You said you didn't know about Buck Transfer's equipment, you didn't know about Klann's equipment. Isn't that right? A. This is where I question whether or not they have the equipment."

**On cross examination by Mr. Maxwell:** The witness testified that of the approximately 100 truck loads daily which are transported from the shipper's facilities, 10 to 15 are destined for delivery within the Cleveland Commercial Zone.

That of the Contract Motor Carriers which serve the proposed shipper, Essential Trucking, Inc. has dedicated 18 pieces of equipment to the shipper's service; I & S has dedicated approximately 15 pieces of equipment to the shipper's service and that the witness is unable to testify as to the amount of equipment which Contract Carrier Corporation has dedicated to the shipper's service. That the shipper has found it necessary to employ common carriers in addition to their contract carriers to transport the products of the various divisions of American Steel and Wire.

The witness testified that there are occasions when the shipper predetermines the amount of tonnage which will be offered to a carrier. That on such occasions he would not know whether equipment was available from such carriers to handle more tonnage if it were offered.

The witness stated that his company has done business with Highway Express, Inc., but not during the first half of 1959.

The witness testified that when trailers are delivered to the various locations of the shipper they are occasionally required to wait for loading due to congestion. On redirect examination by Mr. Works the witness testified that arrangements for motor carrier service are made during business hours and that there is no one present at the plants during

the evening and night hours to straighten out difficulties which may arise or to order new equipment that may be necessary; but that those in charge can be reached at home until midnight.

On recross examination by Mr. Maxwell, the witness testified that trucks are ordered during daytime business hours for those products which are to be loaded during the evening and night shifts.

**SUMMARY OF PROTESTANT'S EVIDENCE:**

**Mr. Charles W. Buck** testified that he is owner of the Buck Transfer Company, holder of Certificate No. 337-I

The witness testified that it would take approximately three-quarters of an hour for equipment from his yard to reach the various locations of the shipper. That Buck Transfer has approximately 55 flat trailers including 4 high-side closed vans which are not licensed.

The witness testified that his company has had experience in transporting the various types of products which the shipper has testified to at this hearing. That his company is available for call six days a week and that customers have an emergency number which they can call on Sunday. The witness testified that if his company was called upon by American Steel and Wire to supply the type of equipment which they have testified they need, his company would make that equipment available to them. That his company could spot equipment at their various locations if they were called upon to do so.

The witness testified that his company could perform, under their present authority, the types of service which the supporting shipper witness testified his company requires.

**On cross examination** by Mr. Merwin the witness testified that Buck Transfer owns approximately 24 tractors and leases an additional 10. That the ability to make equipment available depends upon the demand for that type of equipment at a particular time.

On redirect examination by Mr. Brandon the witness testified that brokers do not dictate to his company the amount of tonnage which may be hauled on leased equipment.

That if American Steel and Wire indicated that they would have a regular need for the service of Buck Transfer his company would make such additions to their fleet as would be necessary to handle the freight offered.

**Mr. Carl Munn** testified that he is President of Cleveland Freight Lines, Inc., holder of Certificate No. 3550.

The witness testified that his company handled more freight for the American Steel and Wire than Mr. Dunn had testified; that all freight was handled on a truck-load rate. Mr. Munn stated that his company was not guilty of any "no shows" during the first half of 1959. That on one occasion the personnel of the American Steel and Wire overlooked the trailer which had been placed on the company's lot.

The witness testified that his company operates approximately 55 pieces of equipment including 26 trailers of various types, approximately 14 tractors and 10 to 12 straight trucks. That their equipment includes flat-bed trailers and open-tops, high-side, open van type and flat. The witness stated that his company has had experience in the transportation of various types of iron and steel articles which the shipper has

described. That his company has on file with the P. U. C. O. tariffs covering the rates on these items.

The witness stated that his company is not available 24 hours a day but that customers are given emergency numbers which they can call in the event special needs arise.

**On cross examination** by Mr. Merwin the witness testified as follows: That Cleveland Freight Lines, Inc. is predominately a general commodity hauler of freight. That the rates pertaining to iron and steel articles are generally at a lesser rate than those for general commodities.

**On redirect examination** by Mr. Brandon the witness testified that the additional labor costs which his company would incur by operation on Sunday are due to the terms of the labor contract which is presently in effect.

**Mr. Joseph J. Capak** testified that he is Sales Manager of John Klann Moving and Trucking Company and that as such he is familiar with the operation of the company. That his company is the holder of Certificate No 533-I.

The witness testified that the John Klann Moving and Trucking Company has 13 flat trailers, 8 open-tops, high sides and 23 vans. That they also have the power equipment to go with these trailers. The location of his company is within 30 minutes of all three divisions of American Steel and Wire which have been testified to during the hearing. That his company has a dispatcher on duty until approximately 9 or 10 o'clock every evening and until 2 or 3 o'clock on Saturday afternoon and there is an emergency number which customers may call at other times.

That he has solicited business from American Steel and Wire but that during the six years which he has been with The Klann Company no business has been received from American Steel and Wire. The witness testified that if his company received a call for service from American Steel and Wire they could make flat-bed equipment available to that shipper and that if additional equipment were needed they could, upon reasonable expectation of receiving business, secure such equipment as may be necessary.

On cross examination the witness stated that of the 23 vans owned by his company 9 are refrigerated.

**Mr. T. J. Waite** testified that he is President and General Manager of Highway Express, Inc., holder of Certificate No. 1354-I. That his company is experienced in the transportation of iron and steel products.

The witness testified that his company owns 30 doubles, 80 tandems, 60 high-side trailers which are approximately 40% open and 201 vans.

Mr. Waite testified that his company has always had equipment available for the transportation of freight when they were called upon by American Steel and Wire.

**EXAMINER'S DISCUSSION:**

In cases such as the instant one it is incumbent upon the Applicant to sustain the burden of proof required of him. In **Jones v. P. U. C. O.,** **141 Oh St 237**, the Supreme Court of Ohio made the following pronouncement:

"3. Ordinarily, it is incumbent upon a contract motor carrier who seeks permission to add a shipper to his list, to show a deficiency in the service of a subsisting and protesting common carrier, that there is a demand for the proffered service, and that the filing of such demand will not conflict with the public interest."

This paragraph from the syllabus in the Jones case sets forth three points which the Applicant in this case must establish in order to be successful in his application. They are (1) a need, in the instant case the witness on behalf of American Steel and Wire has established such a need, (2) a deficiency on the part of the subsisting and protesting common carriers, and (3) no conflict with public interest.

As to the second factor, deficiency. It is the opinion of this Examiner that the Applicant, Dworkin, Inc., has shown that such a deficiency does exist in the service available from the subsisting and protesting common carriers.

Testimony offered on behalf of the Applicant indicates that the proposed shipper must schedule turns for the loading of equipment and the failure of a carrier to show up on schedule can result in a backlog of loading; that due to limited loading and storage space such a backlog can affect production. Further, that the shipper requires equipment to be available around the clock seven days a week and requires the service of someone from the carrier company to spot the equipment in the yards of the shipper.

The various Protestants in this matter testified that they had equipment of the type needed and would ordinarily have equipment available to meet the needs of the shipper, depending upon the demands of the general public for equipment at a particular time. The Protestants also testified that they would add additional equipment to their respective fleets if they were assured that traffic offered by the American Steel and Wire would justify it.

From the nature of the operation conducted by American Steel and Wire it appears that they require transportation available on call; that the inability to be definitely assured of transportation facilities, or the failure of a carrier to appear at the shipper's premises at his appointed "turn," could result in a backing up of products in their limited loading and storage facilities and in turn affect production. It therefore appears that there is a deficiency in the service available from the subsisting and protesting common carriers.

**ULTIMATE FINDINGS—**

(1) The instant application is in proper form and all technical requirements of the statutes have been met;

(2) Publication has been made as required by law;

(3) The Applicant is a proper party to whom the proposed authority may be granted;

(4) The Applicant established a need on behalf of the supporting shipper for the proposed service and a deficiency in the service presently offered by the subsisting and protesting common carriers; and therefore the Protests are not well made and should be disallowed; and

(5) The instant application is well made and should be granted.

**RECOMMENDATION:**

It is recommended that the instant application be granted.

Respectfully submitted,
Thomas H. Williams,
Attorney Examiner

Dated—April 13, 1960
CC: Appearances
THW/mr